645 So.2d 708 (1994)
Tony RICHARD & Vinnell Richard, Plaintiffs-Appellants,
v.
Dr. Lalith S. WIJAYASURIYA, M.D., Dr. James Harrell, M.D., Dr. Viju (Vidyadhar) Akkaraju, M.D., Lafayette Radiology Associated, Lafayette General Medical Center, Dr. Steven Snatic, M.D., Dr. Robert Rivet, M.D., and Dr. Jack Hurst, M.D., & Winthrop Pharmaceuticals, etc., Defendants-Appellees.
No. 93-1410.
Court of Appeal of Louisiana, Third Circuit.
October 5, 1994.
Rehearing Denied December 14, 1994.
*709 Gary Lee Boland, Lee H. des Bordes Jr., Baton Rouge, for Tony Richard et ux.
Marc W. Judice, Lafayette, for Dr. Lalith S. Wijayasuriya et al.
Charles J. Boudreaux, Donlon Pugh, Lafayette, for Dr. Steven Snatic.
John A. Bivins, Harmon F. Roy, Lafayette, for Dr. Robert Rivet.
Before YELVERTON and COOKS, JJ., and BERTRAND[*], J. Pro Tem.
YELVERTON, Judge.
Tony Richard and his wife brought this medical malpractice action to recover damages when he became paralyzed after surgery on his back. A jury found that Dr. Steven Snatic, a neurologist who treated Richard, and Dr. Robert Rivet, the neurosurgeon who operated on him, were not guilty of malpractice. Richard and his wife appeal these findings. They also appeal a summary judgment in favor of Dr. Lalith Wijayasuriya and Dr. Vidyadhar Akkaraju, the radiologist and neuroradiologist respectively, who took films of Richard's back. Additionally, they appeal the failure of the trial judge to recuse himself from hearing the motion for summary judgment. Finally, they assign errors due allegedly to inadequate jury instructions: failure to give an instruction on res ipsa loquitur, and failure to give an instruction on the names and existence of other people who may have contributed to the alleged negligent acts.
We affirm the jury verdicts for Drs. Snatic and Rivet, and the summary judgment for Dr. Akkaraju. We reverse the summary judgment as to Dr. Wijayasuriya, and remand.

FACTS
In June 1988, Richard went to see Dr. Scott Gremillion, an internal medicine practitioner in Jennings, Louisiana, complaining of numbness in his legs. Dr. Gremillion determined that Richard needed a neurologist. *710 He referred Richard to Dr. Snatic of Lafayette.
Dr. Snatic examined Richard. His foot reflexes revealed bilateral ankle clonus. This finding meant that something was happening to Richard's brain or his spinal cord. Dr. Snatic wanted Richard to go to the hospital immediately for a myelogram and CAT scan. Richard was admitted to Lafayette General Hospital for these tests on June 27.
On that same day Dr. Wijayasuriya, a radiologist, performed a myelogram from L-2 up to the top of the cervical region. Dye injected into Richard's back revealed an almost complete block at T9-T10 due to compression on the spinal cord by bony overgrowth. There was compression on the theca which surrounds the spinal cord at T8-T9 and a lesser compression on the spinal cord at T7-T8. There did not seem to be a problem at T6-T7. Dr. Wijayasuriya did not see any problems above T7 and he found nothing symptomatic below T10. After the myelogram, he did a thoracic CAT scan from the top of T7 to the top of T11. He found three large focal bony collections identified in the canal at the levels of the interspaces between T7-T8, T8-T9 and T9-T10. These bony collections were seen to cause compression of the theca and to some extent the cord.
After Dr. Snatic reviewed the films with Dr. Wijayasuriya, and it became clear that Richard's problem was not something he could treat with medication, he consulted Dr. Rivet, a neurosurgeon. Dr. Rivet reviewed the myelogram and CAT scan and recommended immediate surgery.
Dr. Rivet operated the next day, Tuesday, June 28. He took off the spinous processes of T9-T10 and T8. Next he drilled away the facets at T7-T8, T8-T9, and T9-T10. Then he laminectomized laterally and removed the remaining portions of the lamina. There was severe tightness and stenotic disease at T9-T10 so that he could not pass a Woodson between the dura and the underlying bone. He bit a small portion of the spinous process of T7 off, but did not do a total laminectomy of T7. The surgeon was then able to proceed to laminectomize and do a medial facetectomy. As he approached the T8 level, Dr. Rivet noticed pulsation in the dura and he could pass a Woodson freely, indicating no further compression was present. He closed up.
After Richard woke up in recovery, he could not move his legs. Dr. Rivet, who was still in the hospital, ordered a CAT scan from T6 through T11. He reviewed the CAT scan with another neurosurgeon, Dr. Jack Hurst, and with Dr. Akkaraju, the neuroradiologist who performed the CAT scan after surgery. This CAT scan revealed a severe bony encroachment on the spinal canal at the level slightly above the level of surgery and laminectomy. It showed no blood clot, so it was thought there could either have been a stroke of the spinal cord or there could be swelling which would require further decompression.
Dr. Rivet then performed a second surgery with the help of Dr. Hurst. After opening Richard's back, it did not appear that there was pulsation of the cord so the surgeons opined that the cord had swollen. The remaining spinous processes of T7 were removed and the laminectomy was completed. There appeared to be significant pressure on the thecal sac at T7 and at the facet joint of T6-T7. A portion of the lamina at T6 was removed and the cord began to pulsate in a normal fashion. Dr. Rivet felt that he had circumvented the area which prior to the onset of the swelling was not symptomatic.
Following this surgery Richard never regained complete function and feeling in his lower torso and legs. The postoperative diagnosis was paraplegia secondary to postoperative spinal cord surgery with swelling. It was for damages resulting from this partial paraplegia that the Richards filed this suit. Summed up, the suit alleged that each of the four involved doctors were guilty of malpractice. Dr. Snatic was wrong in his neurological diagnosis. Dr. Wijayasuriya did not perform complete radiological tests and did not diagnose exactly where in Richard's back the problem was. Dr. Rivet performed neurosurgery at the wrong level: He operated at T8, T9, T10, and T11; he should have operated at T7, T8, T9, and T10. Dr. Akkaraju, to protect his partner, Dr. Wijayasuriya tried to *711 conceal the true nature of his radiological findings after surgery.

ISSUES ON APPEAL
What we are being asked to review essentially are findings of fact regarding whether one or more of four doctors committed medical malpractice. These findings come to us in two separate judgments. One was a summary judgment granted by the trial judge on the eve of trial and dismissing two of the doctors from the case. The other was a judgment on a verdict rendered by a jury dismissing the other two doctors from the case. We will take up the summary judgment first because it was decided first, at a time in these proceedings when the record consisted of the pleadings, depositions, affidavits and other summary judgment evidence before the trial began. Next we will consider the case which was tried on the merits and decided by the jury. We will then consider the issue of whether the trial judge should have recused himself, an issue involving both judgments. Finally, we will address the two allegedly incorrect jury instructions which, of course, involve only the judgment based on the jury verdict.

SUMMARY JUDGMENT
The Richards claim the trial court erred in granting the motions for summary judgment on the eve of trial of Dr. Wijayasuriya and Dr. Akkaraju, the radiologist and neuroradiologist who performed the scans on Richard. They claim that the summary judgment evidence before the trial court at the time of this ruling shows that there were contested issues of material fact sufficient to defeat both motions. We agree that summary judgment for Dr. Wijayasuriya was inappropriate. We affirm the judgment in favor of Dr. Akkaraju.
A party seeking summary judgment has the burden of showing a complete absence of a genuine issue of material fact. All doubts as to the absence will be decided in favor of a trial on the merits and no summary judgment will be granted, even if the trial court has grave doubt regarding a party's ability to establish disputed facts. La.Code Civ.P. art. 966; Tipton v. Lewis, 403 So.2d 806 (La.App.2d Cir.1981).
With respect to the liability of Dr. Akkaraju, he did not become involved in the treatment of Richard until after the first surgery when Richard had already become paralyzed. His sole involvement in the case was to perform and interpret the CAT scan performed after the first surgery. The Richards claim that Dr. Akkaraju, in order to protect his colleagues, concealed the truth of the films he made after the surgery. Whether Dr. Akkaraju was telling the truth or not about the x-rays he made was of no moment to his liability in the case. Richard's damage was caused by his paralysis. This occurred before Dr. Akkaraju had anything to do with Richard's case. Dr. Akkaraju cannot be held accountable for something that occurred before his involvement. He was properly dismissed by summary judgment.
In the case against Dr. Wijayasuriya, the burden of proof was on him as the party asking for summary judgment. Under La. Code Civ.P. art. 966, he had to prove that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits showed that there was no genuine issue of material fact, and that he was entitled to judgment as a matter of law.
The summary judgment evidence filed by Dr. Wijayasuriya included the opinion of the second Medical Review Panel, which consisted of three neurosurgeons and indicated that no health care provider in the case did anything wrong; three pages of Dr. Barkemeyer's deposition which established that he was not a qualified radiologist; Dr. Akkaraju's postoperative radiology report; and an affidavit by Dr. Rivet, the neurosurgeon who operated. In response, the plaintiffs filed an affidavit of Dr. Charles Barkemeyer dated May 5, 1992. The affidavit of Dr. Rivet indicated that Dr. Rivet's myelogram showed a complete block to the contrast material at the level of T10 with some involvement at T7 and T8 also, and that he did a decompressive laminectomy from T7 through T10. After this surgery, according to the affidavit, and after the discovery of diminished movement in the lower extremities, a CAT scan was run and Dr. Akkaraju and the *712 doctor concluded that further decompression should be extended in both directions, which was done. Dr. Akkaraju's report, on which Dr. Rivet based his decision to operate the second time, indicated that there was a severe bony encroachment on the spinal canal at the level slightly above the level of surgery and laminectomy.
The affidavit of Dr. Barkemeyer, a neurologist, contains his impression, which we quote:
IMPRESSION: According to my review of the medical records from Lafayette General Medical Center, the onset of Mr. Richard's paraparesis had a temporal association with his initial surgery which was performed on June 28, 1988. A repeat CT scan performed in the postoperative period following the identification of Mr. Richard's paraparesis demonstrated a spinal cord compression at his T6-T7 level. This area of compression was above the level of the initial operation. Mr. Richard's initial operation included laminectomies at T8, T9 and T10. The "severe bony encroachment on the spinal canal at the level slightly above the level of surgery and laminectomy" at the T6-T7 level of spinal cord compression was not identified prior to surgery. After the identification of Mr. Richard's T6-T7 level spinal cord compression by a thoracic CT scan, a decompressive laminectomy was performed at this level several hours later. Mr. Richard's initial surgery was associated with an enhancement of Mr. Richard's spinal cord compression at his T6-T7 level with a resultant myelopathy and paraparesis.
It must be remembered that the trial judge decided and handed down reasons for judgment granting the summary judgment in favor of the radiologist on February 9, 1993, which was the day before evidence began to be taken in the trial on the merits against Drs. Snatic and Rivet. The trial judge based his summary judgment exclusively on the summary judgment evidence described above. In its reasons for judgment the trial court found that neither Richard's treating physicians nor any radiologist had ever asserted that Dr. Wijayasuriya breached the standard of care required of radiologists in their treatment of Richard. He found that the factual disputes raised by Dr. Barkemeyer did not establish genuine issues in this medical malpractice suit because Dr. Barkemeyer was not qualified to express an opinion as to the standard of care required of a radiologist since he was trained as a neurologist.
We cannot agree that this evidence justified summary judgment. It is true that there was no assertion by a radiologist as to the standard of care that Dr. Wijayasuriya should have followed and that he breached that standard of care. By the same token, however, there was no assertion from a radiologist that Dr. Wijayasuriya was not negligent. The summary judgment evidence contained no assertion by any radiologist on that subject. What evidence there was indicated a genuine issue of material fact having to do with malpractice.
Dr. Wijayasuriya as the mover in this motion for summary judgment did not meet the burden of proving he committed no malpractice. Dr. Barkemeyer's testimony indicated that the severe bony encroachment found at level T6-T7 was not identified prior to the first surgery, and that this was where a decompression was performed in the second surgery. This was enough to create a genuine issue of material fact as to whether Dr. Wijayasuriya's treatment of Richard was within the standard of care expected of physicians within his specialty.
Although the Richards may fail to prove that Dr. Wijayasuriya committed malpractice because the evidence in a trial against this doctor may fall short of what the law requires, there was a genuine issue of material fact at the summary judgment stage. For these reasons it was error for the trial court to grant Dr. Wijayasuriya's motion for summary judgment.

MEDICAL MALPRACTICE
The Richards urge that the jury erred in finding on the merits that neither Dr. Rivet nor Dr. Snatic deviated from the standard of care required of them.
The medical facts in the case were thoroughly established. Thirteen doctors testified. *713 The trial took 12 days, with 10 days of testimony. In less than two hours of deliberation, the jury reached a unanimous verdict exonerating both defendants. Our review of the medical testimony in this voluminous record confirms the propriety of that verdict.
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty. The plaintiff must then establish a causal relationship between the alleged negligent treatment and injury sustained. The resolution of each of these inquiries are determinations of fact which cannot be reversed on appeal absent manifest error. La.R.S.9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
Expert witnesses who are members of a medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge or failed to exercise reasonable care and diligence. Martin, 582 So.2d at 1277.
The only expert called on Richard's behalf was Dr. Charles Barkemeyer. He was qualified as an expert in neurology. When alleged acts of negligence raise issues peculiar to a particular medical specialty, then only those qualified in that specialty may offer evidence of the applicable standards. Boudreaux v. Panger, 490 So.2d 1083 (La.1986); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir.1987), writs denied 522 So.2d 562, 522 So.2d 563 (La.1988).
Since Dr. Barkemeyer was a neurologist, the same as Dr. Snatic, he could testify as to whether Dr. Snatic met the standards. In closing arguments before the jury, counsel for Richard suggested to the jury that one to two percent of the fault in the case should be attributable to Dr. Snatic. Richard's description of Dr. Snatic's fault was the generalization that he failed to make a proper diagnosis.
Richard's only medical witness, Dr. Barkemeyer, testified that Dr. Snatic met an adequate standard of care for neurologists in his treatment of Richard. Another neurologist, Dr. Patricia Cook, also testified that Dr. Snatic complied with the standard of care of an expert in the field of neurology in his treatment of Richard. No witness, expert or otherwise, testified that he did not. Since the case against Dr. Snatic was supported by no evidence at all, and even plaintiff's own expert testified that Dr. Snatic complied with the standard of care of an expert in the field of neurology, we will spend no more time in this opinion on this defendant.
Dr. Rivet did the surgery. Before the surgery Richard could walk, and afterwards he could not. Counsel for Richard argued these facts before the jury and argued the conclusion that Dr. Rivet should be assessed with 98% of the fault. The jury exonerated Dr. Rivet of any fault.
Plaintiffs produced no expert testimony from a neurosurgeon. Their expert, Dr. Barkemeyer, was not qualified as an expert in neurosurgery. No expert witness in Dr. Rivet's specialty found a breach of the standard of care. On the contrary, five neurosurgeons testified as to the appropriate standard, and that there was no breach of it by Dr. Rivet. Even Dr. Barkemeyer testified that there was no problem with Dr. Rivet's surgical technique or protocol. Also, two neurosurgeons, Dr. John Jackson and Dr. Dean Moore felt that Dr. Rivet's surgical procedure was adequately performed and his treatment of Richard was within a neurosurgeon's standard of care. In addition, the Medical Review Panel which reviewed this case before suit unanimously found no deviation from the standard of care by Dr. Rivet. Two neurosurgeons were on the Medical Review Panel.
A review of the record indicates anything but malpractice on the part of Drs. Rivet or Snatic. The record is devoid of any evidence that either Dr. Rivet or Dr. Snatic failed to meet the standard of care expected of them in their treatment of Richard. This is an unfortunate situation where Richard's spinal cord was compressed by natural bony growth and when it was surgically decompressed, *714 it became swollen cutting off the blood supply which disrupted the nerve tracts going to his legs resulting in paralysis. Unfortunately, swelling after this type of surgery is a risk.
The object of Dr. Rivet's surgery was to decompress the spinal cord. The surgery accomplished that. Decompression occurred when there was pulsation of the dura. After removing sufficient bone for the cord and dura to be decompressed, the doctor stopped removing bone. This was in accordance with proper neurosurgical technique. The medical testimony established these facts.
The medical record establishes that the immediate cause of Richard's damage was swelling of the spinal cord. We use the term "immediate" because his preexisting spinal stenosis, according to many medical witnesses, had developed to such a dangerous point that complete paralysis was likely to soon occur even without surgery. However, it is probable that the surgical intervention hastened the paraplegia. Richard was fully informed of the risks. Swelling of the spinal cord after decompression surgery sometimes happens. In this case, it resulted in paralysis.
The heavy weight of the medical evidence was that the damage in this case was not attributable to fault on the part of any involved physician, but that it was due to a cause other than negligence. One of the interrogatories which the jury was asked to answer was: "Do you find that Dr. Rivet failed to inform Richard of the material risks of the proposed procedures, and that a reasonable person, if fully informed, would not have undergone the procedure?" The jury answered "No" to that interrogatory. The plaintiffs on this appeal do not assign error to this jury finding of fact. They assign error only as to the failure to find malpractice. For the reasons given herein, we find no error in the jury verdict.

RECUSAL OF TRIAL JUDGE
The Richards also claim that Judge Byron Hebert erred in not recusing himself before he granted the motion for summary judgment dismissing Drs. Wijayasuriya and Akkaraju. They claim he should have recused himself because he was represented by the law firm which also represented Drs. Wijayasuriya and Akkaraju, and that this relationship created an appearance of impropriety. Appellants ask for a reversal for this reason.
Although the error complained of was the failure of the trial judge to recuse himself, we assume that what appellants are complaining about was the failure of the judge to whom the motion to recuse was referred to recuse Judge Hebert. Under La.Code Civ.P. art. 154 when the motion to recuse was filed, Judge Hebert had the option of either recusing himself or referring the motion to another judge for a hearing. He chose the latter option, and the motion to recuse was denied.
This issue has been before this court before by way of a writ application filed by the Richards and this court denied the writ. We adhere to our earlier ruling.
At the time of this trial, Judge Hebert was represented by Pat Juneau of the same law firm representing Drs. Wijayasuriya and Akkaraju. Juneau had been hired on recommendation from the other district judges of the Fifteenth Judicial District Court to represent Judge Hebert in a 1983 pro se civil rights suit filed against him in federal court. The choice of Juneau was from a rotating list of lawyers. The lawsuit itself, in the estimate of the judge who heard the recusal, was a frivolous one. Juneau had not participated in any manner in the present case.
La.Code Civ.P. art. 151B(2) dealing with the grounds for recusal of a judge states that a judge may be recused when the judge employs an attorney handling the cause, not just a member of the attorney's firm. In this case the judge did not employ an attorney representing any of the parties so there was no basis under La.Code Civ.P. art. 151 for even a permissive recusal of Judge Hebert.

JURY INSTRUCTIONS
The Richards have made two assignments of error with respect to the jury instructions. One is that there was no instruction on the names and existence of other persons who may have contributed to the *715 alleged negligent acts, in particular, Drs. Wijayasuriya and Akkaraju. The other was the failure to give an instruction on res ipsa loquitur.
A review of the Richards' requested jury charges reveals that they neither requested a jury charge and interrogatory regarding non-party fault nor did they object to the failure to give such a charge and interrogatory.
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. La.Code Civ.P. art. 1793(C).
For the same reason, the failure to give a res ipsa loquitur charge is not reviewable. Although the plaintiffs requested such a charge, they did not object, when the court gave them an opportunity to do so, to the failure to give that charge. Res ipsa loquitur was not an appropriate charge in any event. From the facts of this well-tried case an inference that the damages were caused by factors other than defendants' negligence could be drawn as reasonably as that it was due to somebody's negligence. Cangelosi v. Our Lady of Lake Med. Ctr., 564 So.2d 654 (La.1989).

CONCLUSION
For the above reasons the judgment of the trial court is reversed with respect to the granting of Dr. Lalith Wijayasuriya's motion for summary judgment and is remanded to the trial court for further proceedings.
In all other respects the judgment of the trial court is affirmed.
Costs of this appeal are assessed equally between the plaintiffs and Dr. Lalith Wijayasuriya.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
NOTES
[*] Honorable Lucien C. Bertrand, Jr., Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.