759 So.2d 821 (1999)
Mary FUSILIER and Lloyd Fusilier, Sr., Ind. and as Legal Guardian of the Minor Lloyd Fusilier, III, Plaintiffs Appellants,
v.
Edward (Ned) DAUTERIVE, Jr., M.D., et al., DefendantsAppellees.
No. 99-692.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1999.
Writ Granted March 24, 2000.
*822 J. Minos Simon, Lafayette, for Mary Fusilier and Lloyd Fusilier, Sr.
Marc W. Judice, Lafayette, for Edward W. Dauterive, (Ned) Jr., M.D., et al.
BEFORE: SAUNDERS, PETERS AND GREMILLION, Judges.
SAUNDERS, Judge.
This matter arises from a medical malpractice action stemming from a laparoscopic cholecystectomy performed on the plaintiff on November 9, 1990. Several problems arose during the procedure, requiring an immediate laparotomy and abdominal exploration and resulting in serious injuries to the plaintiff. The plaintiff brought this medical malpractice action after a medical review panel found no negligence on the part of Doctors Dauterive and Fernandez and Iberia General Hospital. The trial court dismissed Dr. Fernandez and Iberia General Hospital on *823 summary judgment, and a jury found no negligence of the part of Dr. Dauterive. We affirm.

PROCEDURAL HISTORY
Mary Fusilier, (Plaintiff), underwent a laparoscopic cholecystecomy on November 9, 1990, performed by Dr. Dauterive and assisted by Dr. Fernandez. Plaintiff suffered a long recovery period with much difficulty as a result of the procedure. Plaintiff brought suit under the Louisiana Medical Malpractice Act against defendants, Dr. Edward W. Dauterive, Jr. (Dr. Dauterive), Dr. Ralph Joseph Fernandez (Dr. Fernandez), and Iberia General Hospital (IGH). On August 6, 1992, a medical review panel found the three defendants met the applicable standard of care, and Dr. Dauterive obtained adequate consent, demonstrated appropriate skill as a surgeon and treated the complications that arose during Plaintiff's surgery appropriately.
Plaintiff then filed suit in the district court against Dr. Dauterive, Dr. Fernandez and IGH. Dr. Fernandez and IGH were dismissed on motion for summary judgment. After a jury trial, October 26 to November 2, 1998, Dr. Dauterive was found to have met the appropriate standard of care, and to have acted with informed consent. Judgment was signed on November 11, 1998, dismissing all claims against Dr. Dauterive.

FACTS
Plaintiff was first seen by Dr. Dauterive, a board certified general and vascular surgeon, on May 8, 1990. She was complaining of nausea, indigestion, and fatty food intolerance. With similar complaints the year before, Plaintiff had seen a different physician who determined she had a gallstone which needed to be surgically removed. At that time, she declined surgery. During the May 8, 1990, visit with Dr. Dauterive, Plaintiff was found to have a five millimeter gallstone in her gallbladder; he recommended observation and symptomatic treatment.
On July 30, 1990, Plaintiff returned to Dr. Dauterive with more severe complaints of the same problems. At this time, Dr. Dauterive discussed with her different options for treatment, including conventional and laparoscopic cholecystecomy. She was given a booklet detailing the laparoscopic procedure along with the associated risks. After a chest x-ray revealed Plaintiff had borderline congestive heart failure, Dr. Dauterive delayed proceeding with surgery until she was treated for this separate medical problem. Plaintiff received treatment for her heart condition and, in October 1990, Dr. Dauterive determined Plaintiff was ready to schedule surgery.
Prior to surgery, Dr. Dauterive discussed the pros and cons of conventional as opposed to laparoscopic cholecystectomy; he informed her that if any complications arose, an abdominal exploration would be necessary. Assisted by Dr. Fernandez, a gynecologist familiar with the use of the varies needle and trocar instruments used in the procedure, Dr. Dauterive performed the operation on November 9, 1990. A summary of the laparoscopic cholecystectomy procedure and the subsequent events follows:
A small incision was made immediately above the umbilicus, and a varies needle was inserted. Three to four liters of carbon dioxide were instilled, creating 12mm of pressure inside Plaintiff's abdomen and a visual field for the procedure. After the varies needle was removed, a 10mm trocar was inserted through the incision. Through the trocar, the laparoscope was introduced, facilitating visualization of the abdomen. No bleeding was noted, and the remaining trocars were introduced. The gallbladder and carbon dioxide were then removed and the 10mm punctures in Plaintiff's abdomen were closed. After the carbon dioxide removal, Plaintiff became acutely hypotensive. Blood was noted in her oral cavity. A laparotomy *824 was performed (Plaintiff's abdomen was opened up) and upon abdominal exploration, her stomach was found to be distended and could not be decompressed with the nasogastric tube. Accordingly, a large gastrotomy was performed on the anterior portion of her stomach from which a large amount of clotted blood was removed. A suspected duodenal ulcer led to the gastrotomy being carried to the second portion of Plaintiff's duodenum. There, no ulcer was found. Upon further inspection of the abdominal cavity, a mesenteric laceration below the duodenum and a through and through duodenal perforation was found with blood welling up from the duodenum. At that time, major vascular injury was suspected and so Dr. Bill Harkrider was called for assistance. A duodenal and aortic perforation forming an aorticoduodenal fistula was suspected. Essentially, it was thought that Plaintiff's perforated aorta made a small connection with her perforated duodenum and was intermittently bleeding into the intestine from the aorta. Apparently, this bleeding greatly increased when the pressure created by the carbon dioxide was released; it had been tamponaded off during the two hour procedure. Plaintiff's duodenum and right colon were mobilized and a laceration was found on the infra renal aorta at its mid portion between the renal arteries and aortic bifurcation. This laceration was sewn. A small puncture wound was discovered in the mid ascending colon which Dr. Dauterive's report noted was likely created by a Babcock used for traction. This was stapled and later exteriorized in the procedure. The posterior 2mm puncture of Plaintiff's duodenum was sewn, and the anterior duodenotomy, gastrotomy and pyloroplasty were stapled closed in a transverse fashion. Finally, a small 2mm laceration of Plaintiff's splenic capsule was repaired. The cecal staple line was then exteriorized through a right sided stab wound in the abdomen (a colostomy was performed), and then her abdomen was closed. It is suspected that Plaintiff's aorta had been perforated when Dr. Dauterive put in either the varies needle or a trocar. Thirty eight units of blood and nine units of plasma were used to treat Plaintiff's blood loss. The operation took eight hours.
Plaintiff was sent home from the hospital by ambulance on December 24, 1990. Five days later, she returned to the hospital. Plaintiff was suffering from adhesions and herniation with infarct of her small bowel. Dr. Harkrider performed a hemicolectomy wherein half of her large intestine was removed. He also performed a small bowel resection. She remained in the hospital until January 18, 1991, during which time she suffered from sepsis. On January 18, 1991, rather than being sent home, Plaintiff was transferred to the skilled nursing (SNIF) unit at Dauterive Hospital where she remained until February 14, 1991. When she left the SNIF unit, she was sent home again by ambulance.

LAW AND ANALYSIS
Plaintiff presents four questions for review, all of which allege the trial court committed legal error. Appellate review of legal error is discussed in Evans v. Lungrin, 97-0541 (La.2/6/98); 708 So.2d 731, 735, (citations omitted):
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo.

*825 I. FIRST ASSIGNMENT OF ERROR:

Plaintiff argues the trial court legally erred when it accepted a standard of care below the standard of ordinary care in allowing mutilation of a patient's internal organs and disregarding any act of negligence as a mere "complication" of the surgery. Plaintiff notes that the problems that occurred during the laparoscopic cholecystectomy procedure were uncontradicted; particularly, her duodenum, aorta, and mesentery were perforated. Further, when trying to remedy these perforations, Dr. Dauterive punctured Plaintiff's large intestine, creating a hole, and tore her splenic capsule. Plaintiff argues that such gouging was not part of an approved medical technique as admitted by Dr. Dauterive. Rather than being mere "complications" of the procedure, Plaintiff asserts that these injuries could only be the product of medical malpractice.
La.R.S. 9:2794(A), in pertinent part, sets forth the burden of proof in a negligence action against a physician:
[W]here the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
In Richard v. Wijayasuriya, 93-1410, pp. 9-10 (La.App. 3 Cir. 10/5/94); 645 So.2d 708, 713, writ denied, 95-0158 (La.3/17/95); 651 So.2d 273, this court explained:
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty. The plaintiff must then establish a causal relationship between the alleged negligent treatment and injury sustained. The resolution of each of these inquiries are determinations of fact which cannot be reversed on appeal absent manifest error. La.R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
In Hebert v. Podiatry Insurance Co. of America, 96-567, p. 15 (La.App. 3 Cir. 10/9/96); 688 So.2d 1107, 1116, writ denied, 96-2726 (La.1/6/97); 685 So.2d 117, we discussed:
Defendants' requested charge number six reflected the general rule that a medical specialty standard of care is "best determined from testimony of other experts in the field." Broadway, 582 So.2d at 1372. We note that in Pfiffner[ v. Correa], 643 So.2d [1228] at 1233[(La.1994)], the supreme court, in emphasizing the modifier "best" in the subject phrase, construed this rule to mean that such expert testimony is "not absolutely required. Although such testimony is persuasive, it is not always controlling." (Citations omitted.)
The exceptions to this general rule of specialty-specific testimony include (1) when the physician does an obviously careless or negligent act, and (2) when the expertise necessary to treat a certain condition or to perform a particular procedure is not limited to one specialty.
Plaintiff reviews in her brief the testimony of Doctors Chaisson and McKernan, who discussed complications of a procedure as related to the reasonable standard of care required of a surgeon. Plaintiff asserts that for the jury to have found in favor of Dr. Dauterive, it must have accepted *826 the testimony indicating that as long as injuries, labeled "complications," suffered by a patient resulting from a surgical procedure are recognized and remedied by the surgeon, then such care falls within the reasonable standard expected of surgeons. Plaintiff argues that for the jury to have found Dr. Dauterive did not violate the standard of care, it must have followed Dr. Chaisson's reasoning which rises to no standard at all. We disagree.
Dr. Edward Chaisson, a general surgeon, testified, "in the last nine years or so, I've done six or seven hundred laparoscopic cholecystectomies." He performed one of the first ones in Louisiana in September or October of 1989. He explained that he was initially assisted by gynecologists for guidance with introduction of the instruments into the patient. He had never practiced on animals before performing his first laparoscopic cholecystectomy. He had only observed Dr. Joe Rittick do it three times. Dr. Chaisson served on the medical review panel and, after reviewing the chart, concluded Dr. Dauterive acted within the standard of care required of general surgeons. Dr. Chaisson noted that there were very few formal training courses for lapraoscopic cholecystectomy, and he was aware that Dr. Dauterive had attended a two day training seminar in Hattiesburg, Mississippi, including one day of lecture and one day of operating on pigs. Dr. Chaisson testified that he felt that more than two days of a course was not necessary though he had never attended such a course. While Dr. Chaisson was testifying, the following colloquy transpired:
Q: In this particular case, weas you know, there was perforation of a branch of the aorta, a perforation I think as well of the duodenum. From your review of the records, Doctor, does that complication indicate to you any want of skill or lack of appropriate technique, the fact that this complication occurred?
. . . .
A: There's no question that every surgeon has complications. And this wholein the medical review panel, the question was: does this fall below the standard of care? And like I said, all doctors have complications. And this, no question, is a complication. An individual complication by itself is not below the standard of care. An excessive number of complications may be below the standard of care.
I've had three patientsI've been in practice almost fifteen years in Baton Rouge. I've had three patients with gallbladder problems that have died. One patient was a dialysis patient that developed biliary pancreatitis and died. I had one patient that died upon intubation, a healthy 41-year old woman, who went into bronchospasm and died. And I've had one death from a perforated bowel. And that's in several hundred cases. If you look at any one of those cases individually, I guess, you know, all those people thought it was below the standard of care.
But this is not an unheard of complication. It's happened before. As I said, I've had a bowel injury. My partner's had an iliac vein injury laparoscopically. There have been common duct injuries in Baton Rouge. Everyone has complications.
Dr. Chaisson stated that he felt Dr. Dauterive met the standard of care for general surgery in the treatment of Plaintiff. He also added:
Yes. And my definition of the standard of care is that when the patient has a complication, the complication is recognized, because everyone has complications, and treat it appropriately. And obviously, this coming from a physician, so it may be different from the lay person's. But I think everyone has complications. And I feel that if the physician recognizes the complication and handles it appropriately, that's about as good as we're ever going to get.
*827 Also testifying to the standard of care, Dr. John Barry McKernan, a general surgeon, performed the first laparoscopic cholecystectomy in the United States, with Dr. Sai, on June 22, 1988, in an outpatient surgery setting. He testified at trial that Dr. Dauterive "definitely met the standard of care." He explained that, "I'd have to say that it probably was much more extensive, his training and experience, than was generally encountered in the rest of the country." Dr. McKernan noted that in 1990 and 1991, there were not any nationally accepted standards and he stated that "there's still not any national standards. They're (sic) only recommendations." Responding to the question of whether Dr. Dauterive properly managed the problem of the punctured aorta, he stated, "I think this patient owes her life to this surgeon. I think if this would have happened to most surgeons in the United States, she would not have survived."
On cross-examination, Dr. McKernan identified an article that he wrote with Dr. Sai, written in 1989 and published in March 1990 in the Journal of the American Association of Georgia which explained that the Surgery Center in which he operated required:
[S]urgeons wishing to perform laparoscopic procedures meet the following criteria: One, completion of a basic course in general laparoscopy; Two, performance of 25 to 50 diagnostic laparoscopies under direct supervision in a preceptored setting; Three, completion of a course in operative laparoscopy which utilizes specific operative techniques, instrumentation, and the use of fiber lasers; Four, completion of a course in each separate operative technique, being preceptored in that technique for at least five of each procedure.
Yet, at trial, Dr. McKernan testified that he was wrong and that "once the courses were set up, you didn't have to do all these diagnostic laparoscopies and other things." In over 1,000 laparoscopic cholecystectomies that he had performed, Dr. McKernan had never punctured a patient's aorta.
In Pfiffner v. Correa, 94-0924, 94-0963, and 94-0992 (La.10/17/94); 643 So.2d 1228, the Louisiana Supreme Court discussed the role of expert testimony in establishing the standard of care in a medical malpractice action. The Pfiffner court noted the split in the circuit courts over whether an expert is necessary to determine the standard of care; then the court recognized:
[S]ituations in which expert testimony is not necessary. Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence.
Id. at 1233, (citation omitted).
After reviewing the testimony of Doctors Chaisson and McKernan, it is evident from the record that the concept of "complications" was harmlessly used interchangeably with the concept of "risks" associated with a surgical procedure. We will consider the two concepts.
As defined by DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, pg. 363 (28th ed.1994), a "complication" is "1. a disease or diseases concurrent with another disease. 2. the concurrence of two or more diseases in the same patient." DORLAND'S defines "risk" as "a danger or hazard, the probability of suffering harm." Id. at 1468. Hence, "risk" is a measure of suffering a harm. For medical procedures, risk is a factor that the medical profession calculates and, if considered material, presents to a patient for consideration.
It is readily apparent to this court that the concept of "complication," a disease process concurrent with another disease, is not synonymous with the concept of risk. However, we find the determination of standard of care and whether Dr. Dauterive's methods fell within it does not hinge *828 on this distinction. Rather, we consider whether the multiple injuries imposed iatrogenically by Dr. Dauterive on Plaintiff, rose to the level of violating the standard of care expected of surgeons.
We again refer to DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 815 (28th ed.1994) to define the term: iatrogenic: "resulting from the activity of physicians.... any adverse condition in a patient occurring as the result of treatment by a physician or surgeon, especially to infections acquired by the patient during the course of treatment." The jury had to decipher the various iatrogenic injuries suffered by Plaintiff and determine whether those injuries fell within the scope of material risks to which Plaintiff consented or were outside of a reasonable standard of care. Testimony was given at trial by Dr. Dauterive himself, Dr. Fernandez, and Dr. Rout.
We first consider the description of events following the gallbladder removal as explained by Dr. Dauterive. Dr. Dauterive testified that he perforated Plaintiff's aorta when he inserted either the varies needle or trocar; he believed it was the varies needle. He testified that before Plaintiff, he had practiced the laparoscopic procedure on two swine, during a two-day course taken six months before performing surgery on Plaintiff. Dr. Dauterive stated that courses such as the one he took were the standard for surgeons at that time. He commented, "every surgeon in New Iberia went through the entirethe same process. In fact, every surgeon in the United States, on their first laparoscopic cholecystectomy, was assisted by an OBGYN doctor."
Dr. Dauterive explained that, when Plaintiff was hypotensive after the gallbladder was removed, "the source of the bleeding had to be discovered fast. In the process of mobilizing the colon to find the source of the bleeding, which was the duodenum and the aorta, a small rent was iatrogenically induced into the colon." Dr. Dauterive noted that they stapled the hole shut. Explaining the laceration that he made on Plaintiff's splenic capsule during the open procedure, Dr. Dauterive detailed: "in the process of mobilizing the organs or retraction, we have these retractors that we insert into the belly. It was a small laceration and taken care of in an expeditious fashion." Dr. Dauterive recalled that, as a general surgeon, he had on numerous occasions used trocars in the peritoneal space where no pneumoperitoneum was created.
Assisting Dr. Dauterive that day was Dr. Fernandez, an obstetrician/gynecologist. He described Dr. Dauterive's varies needle and trocar insertion as appropriate. He testified that the first time he was aware of a problem was when blood appeared in the nasogastric tube after the gas was let out of Plaintiff's abdomen at the end of the surgery. He had no criticisms nor saw any problems with Dr. Dauterive's entry technique with the varies needle, trocars, or use of laparoscopic instruments in this case. He believed that the injury to Plaintiff's aorta was done by the varies needle.
Dr. William Robert Rout, general surgeon, felt Dr. Dauterive had violated the standard of care. Dr. Rout was one of the first doctors to perform laparoscopic cholecystectomy and the first to do so in Florida in 1990. After reviewing the medical records of Plaintiff, Dr. Rout testified: "It is my opinion Dr. Dauterive's performance that day was not what I would consider the standard of care." Dr. Rout also testified that the two day course, the "Laparoscopic Laser-Assisted Cholecystectomy Workshop," taken by Dr. Dauterive six months prior to Plaintiffs surgery was not sufficient training, without more, to prepare him adequately to perform the laparoscopic cholecystectomy; Dr. Rout explained Dr. Dauterive should have assisted in other laparoscopic procedures, as with gynecologists, before attempting the surgery as the primary physician. Dr. Rout also noted a 1977 laparoscopy text, published by Dr. Phillips, which listed as the number *829 one factor for large vessel injury, "inexperienced or unskilled surgeon." Dr. Rout opined that had the operation been performed by a "trained general surgeon in laparoscopic procedure," the injury to Plaintiffs aorta would not have occurred.
On cross, Dr. Rout stated that there were no published national standards on performing laparoscopic cholecystectomy surgery in 1990. He acknowledged that the American College of Surgeons said in 1990:
For optimal quality patient care, laparoscopic cholecystectomies should be performed by surgeons who are qualified to perform open cholecystectomies. Only such surgeons possessing the skill to perform biliary tract procedures are able to determine the best methods of cholecystectomy, and only such surgeons can treat complications consequent to laparoscopic cholecystectomy.
Plaintiff argues that Dr. Dauterive negligently gouged, punctured, and perforated Plaintiff. From the record, it appears that the general consensus is Dr. Dauterive most likely pierced through Plaintiff's mesentery, which is a "membranous fold attaching various organs to the body wall," in this case the duodenum, with the varies needle, not a trocar. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1017 (28th ed.1994). And in that same motion, it appears the needle went through a portion of Plaintiff's duodenum and ultimately pierced her aorta. Plaintiff's case, succinctly stated, is there should be liability on the part of the doctor for puncturing three different organs of the plaintiff, including her aorta. It is noteworthy that Dr. McKernan testified he has never punctured a patient's aorta in more than one thousand operations, and Dr. Chaisson also had not experienced puncturing a patient's aorta in the six to seven hundred laparoscopic cholecystectomies he performed in nine years.
Plaintiff contends that while it may be possible that the risk of the procedure is such that one organ may, on occasion, be damaged, and that perhaps in rare instances it might be reasonable to expect that a second organ might be damaged, it is totally unreasonable to expect that three separate organs would be damaged on a single procedure. We find this argument made by the plaintiff best analyzed in a res ipsa loquitur analysis. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650, 655 (La.App. 2 Cir.1984), (citations omitted), provides:
Res ipsa loquitur is not a substantive legal tenet, but rather an evidentiary doctrine under which a tort claim may be proved by circumstantial evidence. This evidentiary doctrine is applicable where defendant has actual control of the agency, instrumentality or conditions which caused plaintiff's injuries; the evidence as to the true cause of plaintiff's loss is more readily accessible to defendant than plaintiff; and the accident is of a kind that does not occur in the absence of negligence and/or the circumstances attending the accident create an inference of negligence on the part of defendant. Under the principle of res ipsa loquitur, the defendant's negligence is inferred because, under the facts shown, the inference that defendant's negligence caused plaintiff's harm is probable and more plausible than any other explanation propounded. It is crucial to note that, where the doctrine of res ipsa loquitur is properly applicable, the plaintiff need not establish the exact manner in which he was injured, or the precise act or event which precipitated his injury.
It is without question that this defendant has actual control of the agency, instrumentality, or conditions which caused Plaintiffs injuries and that the true cause of her injuries is more readily accessible to him. We must consider whether an accident of this sort happens in the absence of negligence. It was shown that this has not happened in 1,700 surgeries performed by two of the testifying experts. In fact, no testimony was given describing a similar *830 set of difficulties experienced by another physician. Moreover, Dr. Dauterive while taking the position that it is a risk of the procedure, has not offered a plausible explanation of what went wrong with the procedure of inserting the needle which led to the puncturing of Plaintiff's various organs. Certainly, some deviation, either in method or anatomy, led to the laceration of the aorta located in the retroperitoneum, behind the small intestines, covered by mesentery.
Plaintiff argues that where Dr. Dauterive placed instruments through the site of the navel and reached the aorta, after passing through her mesentery and small intestines, such could not have happened without some negligence on his part. This argument is appealing, however, it is one which requires a certain amount of expertise or knowledge of human anatomy in order to be fairly judged, particularly where there is no testimony in the record and no way to discern from an examination of the record as to the relative distance between the entry point on the abdomen to Plaintiffs aorta.
In reading the record, it is the feeling of this writer, at least, that to reach the aorta with either the varies needle or the trocar, would be a most unusual thing and that it should not normally happen because there should be enough area in the peritoneum that it would take a large deviation from normal procedures to reach the aorta. However, this is pure conjecture. No doctors were asked to testify as to the area that the needle or trocar would have to traverse, the size of those instruments, or as to possible anatomic incongruities.[1] It would seem that the peritoneum would have provided a zone of safety within which to move a varies needle or trocar. However, there is no way of knowing the size of this zone of safety relative to each organ that was injured during this laparoscopic procedure. The factfinder was not equipped with enough information to determine the magnitude of deviation of the instrument needed to cause the injuries Plaintiff suffered. It seems very possible that one could surmise that a deviation from the "zone of safety" relative to not just the mesentery and duodenum, but also to the aorta, could well have risen to meet all elements of a res ipsa loquitur analysis.
Nevertheless, under these circumstances, there was insufficient evidence for the jury to conclude that plaintiffs injuries could have resulted from the physician's actions, in the absence of negligence. We, therefore, are compelled to find no error in the jury's conclusion that Dr. Dauterive did not violate the standard of care.

II. SECOND ASSIGNMENT OF ERROR:
Plaintiff asserts the trial court committed legal error when it summarily dismissed Iberia General Hospital from the suit when it violated its own by-laws by allowing Dr. Dauterive to perform a procedure for which he was not credentialed.
We adopt the discussion on summary judgment review by this court in Carriere v. State, 97-1305, p. 3 (La.App. 3 Cir. 3/6/98); 708 So.2d 822, 823-24, writ denied, 98-0958 (La.5/29/98); 720 So.2d 335, to wit:
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Federal S & L, 615 So.2d 318 (La.1993). A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits show that there exists no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966; *831 Haywood v. Louisiana Sugar Cane Products, 96-1151 (La.App. 3 Cir. 3/5/97); 692 So.2d 524.
The first issue that must be addressed in reviewing a trial court's grant of summary judgment is whether any genuine issues of material fact exist. Smith v. Our Lady of the Lake Hosp. Inc., 93-2512 (La.7/5/94); 639 So.2d 730, appeal after remand, 96-1837 (La.9/27/96); 680 So.2d 1163. The reviewing court must next address whether reasonable minds could conclude, based on the facts presented, the mover is entitled to judgment. Id. In other words, summary judgment is appropriate when all relevant facts are brought before the court, the relevant facts are undisputed, and the sole issue remaining is the conclusion to be drawn from the relevant facts. Id.

Reviewing the record, we find summary judgment was appropriately granted to dismiss IGH where no material fact regarding its liability exists. We quote the same language from the Reasons for Judgment that Plaintiff argues in her brief. The trial court explained:
The only fault that Dr. Rout found was that the hospital allowed Dr. Dauterive to perform the surgery before the approval letter from the board of directors. The expert testimony of Dr. J. Barry McKernan, expert witness for Dr. Dauterive, indicated in his deposition that the credentialing process of the hospital was the same if not better than other hospitals in the country in 1990. This was particularly true in light of the fact that both Dr. McKernan and Dr. Rout indicated that in 1990 there were hospitals which were simply determining their own guidelines or procedures for laparoscopic cholecystectomies since there was no uniform standard of care at the time. Accordingly, both on the opinions of the panelists as well as the opinion of Dr. Rout and Dr. McKernan, the credentialing process of the hospital was not negligent.
The trial court concluded its Reasons for Judgment by finding no material question of fact that Dr. Dauterive was qualified to perform the surgery where the hospital was not negligent in its credentialing process and the physicians approved Dr. Dauterive based on his training and the hospital criteria. The trial court found no causal relationship between any negligent injury of the patient by Dr. Dauterive and the fact that the hospital board had not yet rendered its final stamp of approval.
All of the evidence and testimony presented by the various doctors readily indicate that the standards for training for the laparoscopic cholecystectomy procedure itself, much less a hospital's approval regulations allowing its performance, were far from settled in 1990. We agree with the trial court's finding that no genuine issue of fact exists establishing a causal relationship between the acts of IGH and the difficulties suffered by Plaintiff.

III. THIRD ASSIGNMENT OF ERROR:
Plaintiff asserts legal error where the trial court did not allow Plaintiff to present evidence of Dr. Dauterive's lack of credentials. In its Reasons for Ruling on the credentialing issue, the trial court explained:
In the pre-trial stipulations, the contested issues of fact relative to credentialing is whether or not Iberia General Hospital was negligent in properly credentialing Dr. Dauterive's laparoscopic privileges. So I don't find that the plaintiffs in their petition or in the contested issues of fact in the pre-trial stipulation have asserted a cause of action against Dr. Dauterive for lack of credentialing. I do find, however, that they have asserted a cause of action against Dr. Dauterive with regards to improper training. And that would be, I think, relevant on this discussion.
*832 A review of the pretrial stipulations reveals a list of contested issues of fact, particularly:
1. Whether or not Iberia General Hospital and/or its employees were negligent or breached any medical standard of care in their treatment and care of Mary Fusilier on or about 09 November 1990;
2. Whether or not Dr. Edward W. Dauterive, Jr., breached any standard of care, including informed consent;
3. Whether or not Iberia General Hospital was negligent in properly credentialing Dr. Dauterive's laparoscopic privileges;
4. Whether or not Iberia General Hospital's alleged negligence in credentialing Dr. Dauterive's laparoscopic privileges was a proximate cause of Mary Fusilier's injuries; and
5. All other facts pertinent to a determination of legal fault and/or causation are contested.
A stipulation has the effect of a judicial admission or confession, which binds all parties and the court. R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984). Stipulations between the parties in a specific case are binding on the trial court when not in derogation of law, and are the law of the case. Id.

State, Through DOTD v. Clark, 548 So.2d 365, 368 (La.App. 2 Cir.), writ denied, 552 So.2d 395 (La.1989).
Plaintiff's Petition for Damages reveals no inconsistency with the trial court's conclusions based on the parties' pre-trial stipulations. Clearly, Defendant's credentialing was at issue as against IGH. Because IGH was successful on summary judgment and subsequently dismissed, Plaintiff cannot bring a new cause of action against Dr. Dauterive than that cause of action originally asserted against IGH, now a non-party to this suit. Accordingly, we affirm the trial court's ruling excluding such evidence.

IV. FOURTH ASSIGNMENT OF ERROR:
Plaintiff argues legal error where the trial court found Dr. Dauterive obtained informed consent from Mary Fusilier to perform the operation. Dr. Dauterive testified that he told Plaintiff this was going to be his first laparoscopic cholecystectomy. Plaintiff denied this. Plaintiff signed the consent form on August 13, 1990. On October 30, 1990, Plaintiff signed another consent form for a cholecystectomy via laparoscope. Concerning the consent, the following discussion transpired:
Q: In fact, you also testified in your deposition that you didn't specifically tell Mary about a mesenteric laceration, did you?
A: No. The consent is generally obtained in the following manner. We consent the patients by telling them that intra-abdominal injuries can occur. If there is a need for opening the abdomen to correct those injuries, then it is pursued at my professional judgment. And we always mention the possibilities of hemorrhage from an operative procedure. I mean, it's aa standard consent that wewe just tell everybody, from a cyst on the skin to the largest abdominal operation.
Plaintiff, too, testified regarding the nature of consent she gave, as the following colloquy indicates:
Q: Now, you signedand I think your counsel's already identifiedtwo separate consent forms, indicating two different times you discussed with Dr. Dauterive the operation and the risks of the operation; is that correct?
A: Yeah. The reason whylike I said, it wasI was supposed to go in August. Then when I went back in August, he told me he was waiting for his equipment.

*833 . . . .
Q: And both of these indicate that the risks associated with the procedure was death. That's on the form, isn't it?
A: Well I'm gonna tell you whatI'll say it againI don't read good. But Dr. Ned read it.
Q: Dr. Ned read this form to you?
A: He read some paper to me.
Q: Then you signed it?
A: Yes, I did.
Q: And Dr. Dauterive answered all of your questions, didn't he?
A: Well, I'm gonna be honest with you. I didn't ask him too many questions. I put my life in his hands.
. . . .
Q: Yes, ma'am. I understand that. Did you readyou did read the booklet, didn't you?
A: My husband read it the best he could to me. I don't read good.
Q: Well, you remember taking your deposition back in 1992, on June the 24th of 1992, and you were asked: "Do you remember reading about the risks involved in the different surgeries from the booklet?" And you said, "I didn't read it good. My husband did."
A: He read the book, the best of his knowledge.
Q: Yes, ma'am. But you did read it yourself. You said, "I didn't read it good." But you did read parts of it, didn't you?
A: I looked at it, yes.
Q: Yes, ma'am. And your husband read the book to you, didn't he?
A: Not verynot very much. I didn't want to talk about the surgery, because I was afraid. I really wasn't
Q: Okay. Well, do you remember in your depositiondidn't you say, "And you understood the information your husband was giving to you," talking about the book, page 121. So youand you said, "Yes." And so you were asked, "So you felt like you knew what was in the book, because he told you what was in the book?" And your answer was: "He read it to me, and Dr. Ned also told me about it."
La.R.S. 40:1299.40, the Uniform Consent Law, in pertinent part, provides the following guidelines to achieve informed consent:
A(1) Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
We find Dr. Dauterive's acts to gain informed consent from Plaintiff fall clearly within the requirements of the statute. Plaintiff signed not one, but two consent forms which listed those risks of the procedure as required by the statute. Dr. Dauterive verbally discussed the procedure with Plaintiff and she was given an opportunity to ask any questions she may have had. In reviewing the manual given Plaintiff describing laparoscopic cholecystectomy, Dr. Dauterive admitted that it did not explicitly list a perforated aorta as a possible complication, though he explained it did list excessive bleeding which would be caused by a perforated aorta. There is *834 no indication that Plaintiff lacked the capacity to consent to the procedure and there is nothing to indicate that Plaintiff was induced by misrepresentation of material facts.
Plaintiff does argue that she did not know Dr. Dauterive had never performed this procedure before. She testified that if she had known, she would not have allowed him to perform it on her. Dr. Dauterive, however, contradicts this argument with his testimony that he did indeed tell Plaintiff that this was the first time he was performing this procedure on a human. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989), provides the standard for appellate review of fact:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
Where credibility determinations are best evaluated by the factfinder, we must defer to the conclusion of the jury. In the absence of manifest error, we affirm the verdict finding Dr. Dauterive acted within the parameters of the Uniform Consent Statute by adequately informing this patient of the risks of a laparoscopic cholecystectomy.

CONCLUSION
A review of the record reveals no legal errors materially prejudicing the outcome of this trial were made. The testimony and evidence support the legal conclusions drawn, and in light of the foregoing discussion, we are compelled to affirm the conclusions of trial court and jury challenged in this appeal.

DECREE
For the reasons expressed herein, we affirm the jury's finding that Dr. Dauterive acted within the standard of care and acquired appropriate consent. Further, we affirm the trial court's ruling to dismiss Iberia General Hospital on summary judgment and, in light of which, we affirm the trial court's refusal to allow evidence on the credentialing issue as to Dr. Dauterive. All costs of this appeal to be borne by plaintiffs, Mary Fusilier and Lloyd Fusilier, Sr.
AFFIRMED.
PETERS, J., dissents with reasons.
PETERS, J., dissenting.
It is uncontradicted that, during the laparoscopic cholecystectomy performed on Mary Fusilier, Dr. Dauterive perforated her duodenum, aorta, and mesentery. It is also uncontradicted that in the process of attempting to repair this damage, Dr. Dauterive punctured Mrs. Fusilier's large intestine and tore her splenic capsule. While I agree with the majority that the damage caused by Dr. Dauterive's attempts to repair the original damage constituted risks of the emergency procedure employed, I cannot agree that the original damage was not a result of negligence.
As stated by the majority, a plaintiff's burden of proof in a negligence action against a physician is found in La.R.S. 9:2794(A). The first element of that burden is that the plaintiff must establish "the degree of care ordinarily practiced by physicians... within the involved medical specialty." Id. The second inquiry is whether the defendant "either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill." Id.
Establishing the standard of care was especially difficult in this case because Dr. McKernan and Dr. Rout, both recognized pioneers in the field of laparoscopic cholecystectomy, testified that there existed *835 no published national standards in 1990. However, this testimony cannot be interpreted to mean that when there are no national standards for a procedure, the manner in which a physician performs the procedure cannot be considered negligent. In fact, Dr. Rout testified that the two-day workshop taken by Dr. Dauterive was not sufficient training to adequately prepare him to perform the procedure and that he should have assisted with other laparoscopic procedures before attempting the surgery as the primary surgeon. Indeed, even Dr. McKernan was of basically the same opinion when he coauthored the March 1990 article with Dr. Sai. Yet, at trial, Dr. McKernan concluded that the common sense approach of having a surgeon perform "25 to 50 diagnostic laparoscopies under direct supervision in a preceptored setting" could be replaced by a two-day training session. The jury may have accepted Dr. McKernan's testimony in this regard, but we are not bound by the manifest error rule to affirm the trier of fact's evaluation of expert testimony where the stated reasons of the expert are patently unsound. See Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). Dr. McKernan's change of position is disturbing, and his blanket proposition that a two-day training session sufficiently replaces direct supervision merely begs the question without providing reasons why such a proposition is now the case and why such limited training suffices to provide the physician with the degree of knowledge or skill required. Direct supervision provides not only a teaching setting but also a backup important while the physician is gaining experience. I would find Dr. McKernan's testimony patently unsound in that regard.
Further complicating this case, Dr. Chaisson testified that "[his] definition of the standard of care is that when the patient has a complication, the complication is recognized, because everyone has complications, and treat it appropriately.... [I]f the physician recognizes the complication and handles it appropriately, that's about as good as we're ever going to get." In my opinion, the term "complication" and the term "a deviation below the standard of care" cannot be used interchangeably simply because the physician undertakes remedial measures. Dr. Chaisson's definition of the applicable standard of care would, in effect, grant tort immunity to an otherwise negligent physician simply because he or she undertook remedial measures in connection with his or her negligence. La.R.S. 9:2794 does not recognize such an immunity, and it would be improper for us to graft that immunity onto the statute.
In any event, it is my opinion that res ipsa loquitur may be used in this case to prove the plaintiffs' claim. The majority finds without question that Dr. Dauterive had actual control of the agency, instrumentality, or conditions which caused Mrs. Fusilier's injuries and that the true cause of her injuries was more accessible to Dr. Dauterive. However, the majority feels "compelled" to find no error in the jury's determination because there was not enough evidence to conclude that there was no way this injury might not have occurred without negligence on the part of the physician. I agree with the majority that in order to utilize the doctrine of res ipsa loquitur, the plaintiff must prove a foundation of facts upon which the doctrine may be applied. See Bradbury v. Thomas, 98-1678 (La.App. 1 Cir. 9/24/99); 757 So.2d 666 (quoting Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr., 564 So.2d 654 (La.1989)). Specifically, the event must be such that in light of ordinary experience the event gives rise to an inference that somebody must have been negligent. Id.
Importantly, Dr. McKernan testified that he had never punctured a patient's aorta in more than 1,000 operations, and Dr. Chaisson also had not experienced puncturing a patient's aorta in the 600 to 700 laparoscopic cholecystectomies he had performed in nine years. In Dr. Dauterive's first such operation on a human, he *836 perforated not one but three internal mechanisms of Mrs. Fusilier's body. In my opinion, in light of ordinary experience, the perforations are such that they give rise to an inference of negligence. I respectfully disagree with the majority that more evidence was needed, since to require such would be to eviscerate the evidentiary advantage the doctrine of res ipsa loquitur functions to provide by requiring proof by direct rather than circumstantial evidence. I recognize there are risks to any medical procedure, including a laparoscopic cholecystectomy. However, I cannot conclude, given the expert testimony in this case, that a risk of a laparoscopic cholecystectomy, absent negligence, includes the risk that the patient's duodenum, mesentery, and aorta would be perforated in the same procedure.
Therefore, I respectfully dissent from the majority's opinion, and I would reverse the trial court's judgment concerning liability and assess damages.
NOTES
[1] We note there is some discussion in the record suggesting that Plaintiff may have had a distended aorta, resulting from her heart condition; however, there was conflicting and sparse evidence to support this possibility.