STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

MERVIN PRIMEAUX, INDIV. AND ELIZABETH PRIMEAUX, INDIV.

VERSUS

ST. PAUL FIRE & MARINE INS. CO.  AND DR. RICHARD LABORDE

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 99-6418
HONORABLE PATRICIA MINALDI, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Jimmie C. Peters, Judges.

**AFFIRMED.**

James R. Shelton
Durio, McGoffin, Stagg & Ackermann
P. O. Box 51308
Lafayette, LA 70505-1308
(337) 233-0300
Counsel for Defendant/Appellee:
    St. Paul Fire & Marine Ins. Co.
    Dr. Richard Laborde

Todd A. Townsley
Townsley Law Firm
3102 Enterprise Blvd.
Lake Charles, LA 70601
(337) 478-1400
Counsel for Plaintiff/Appellant
    Mervin Primeaux
    Elizabeth Primeaux

**SAUNDERS, J.**

Plaintiff appeals the judgment of the trial court finding that the partial paralysis of his phrenic nerve was not caused by malpractice on the part of Defendant, Dr. Richard Laborde. For the reasons stated below, we affirm.

**FACTS**

On September 3, 1997, Mervin Primeaux was admitted to Lake Charles Memorial Hospital for total left shoulder replacement surgery by Dr. David Drez, orthopedic surgeon. This is a particularly painful procedure which generally requires large amounts of post-operative pain control narcotics. To reduce the amount of pain medication needed after surgery, and to reduce the level of pain during and after the procedure, Dr. Laborde, an anesthesiologist, performed an "interscalene block" on Mr. Primeaux prior to the shoulder surgery.

An interscalene block is an anesthetic procedure involving the nerves of the neck and shoulder region. It is used to anesthetize the upper arm and shoulder region during shoulder surgeries. The procedure involves inserting a large needle with an electrical current running through the tip of the needle. The procedure is a "blind" procedure because the doctor is unable to see where the needle is positioned during the procedure. He must instead rely on external signals created by stimulating the nerves and adjoining muscles with the electrical current from the inserted needle. The current will cause an externally discernable twitch or spasm for various muscle groups, allowing the anesthesiologist to determine proper needle placement for injection of the anesthetic. In Mr. Primeaux's case the procedure was to anesthetize the brachial plexus. The brachial plexus is in close proximity to the phrenic nerve, which controls the diaphragm.

Prior to undergoing the shoulder surgery, Mr. Primeaux underwent a pre-

operative exam by his internal medicine physician, Dr. James T. Shepherd. An x-ray was taken of Mr. Primeaux, which indicated that there was no paralyzation of his diaphragm. After the procedure, while still in the hospital, there were several notations made in Mr. Primeaux's chart stating, "No SOB [shortness of breath] noted." Three days after Mr. Primeaux's discharge from Lake Charles Memorial Hospital he had a follow-up appointment with Dr. Drez. At that appointment Mr. Primeaux still had no complaints of trouble breathing or shortness of breath.

The first time Mr. Primeaux reported any complaint of shortness of breath to Dr. Drez was September 15, 1997, twelve days after his surgery and the interscalene block. At that time Dr. Drez felt Mr. Primeaux's shortness of breath may be due to a reaction to the medication Mr. Primeaux was taking. In a later office visit with Dr. Drez, Mr. Primeaux complained of chest pain. Dr. Drez referred Mr. Primeaux to Dr. Shepherd at the Emergency Room at Park Place Medical Center in Port Arthur, Texas. After performing x-rays and various tests on Mr. Primeaux, Dr. Shepherd diagnosed him with paralysis of the left hemi-diaphragm, caused by damage to the phrenic nerve.

This matter was presented to a Medical Review Panel and their opinion was rendered on July 27, 1999. In their opinion the panel stated they found a probable causal relationship between the perioperative events of September 3, 1997, and Mr. Primeaux's injuries. They also stated, however, that the medical records do not suggest that there is anything Dr. Laborde could have done differently. Their conclusion was there was no finding that Dr. Laborde failed to comply with the appropriate standard of care.

This matter proceeded to trial. After a three-day trial on the merits, a jury returned a verdict in favor of the defendant, Dr. Laborde, finding that he was not liable for Mr. Primeaux's injuries. The claims against the defendant were dismissed with

2

prejudice.

Plaintiffs appeal the judgment of the trial court and assert the following assignments of error:

1)    The jury committed manifest error in failing to find that the most likely cause of the injury was the negligence of Dr. Laborde.

2)    The jury erred in not finding that Dr. Laborde breached the standard of care by causing this phrenic nerve injury.

3)    The jury erred by not properly giving the treating physician's testimony more weight than a non-treating physician acting as an expert for the defendant.

## STANDARD OF REVIEW

We begin by noting the well established rules of appellate review of jury and trial court decisions.

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. . . .
>
> When findings are based on determinations regarding the credibility of witnesses, the manifest error--clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.

*Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989) (citations omitted).

> [T]he appellate court's disagreement with the trial court, alone, is not grounds for substituting its judgment for that of the trier of fact. *Borden, Inc. v. Howard Trucking Co., Inc.*, 454 So.2d 1081 (La.1983). If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Rosell*, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Id*. *Arceneaux v. Domingue*, 365

3

So.2d 1330 (La.1978).

*Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990).

## DISCUSSION

In medical malpractice cases the plaintiff's burden and the physician's standard of care are set out in La.R.S. 9:2794, which states in pertinent part:

> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
> . . . .
>
> C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist, optometrist, or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's, optometrist's, or chiropractic physician's negligence.

In *Fusilier v. Dauterive*, 00-151, p. 7 (La. 7/14/00), 764 So.2d 74, 79, the Louisiana Supreme Court discussed the two-prong burden of proof in medical malpractice cases, as established by La.R.S. 9:2794, stating:

> In a medical malpractice action, the plaintiff has the burden of proving,

4

by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. [*Gordon v. La. State Univ. Bd. of Supervisors*, 27,966 (La.App. 2 Cir. 3/1/96), 669 So.2d 736; *writ denied*, 96-1038 (La. 5/31/96), 674 So.2d 263] (citing *White v. McCool*, 395 So.2d 774 (La.1981)).

In *Fusilier*, the supreme court stated that "[a] physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily exercised by his professional peers under similar circumstances." *Fusilier*, 764 So.2d at 79.

The plaintiff provided testimony by Dr. Shepherd, a specialist in the field of internal medicine and Mr. Primeaux's physician. Dr. Shepherd testified that, in his opinion, Dr. Laborde's performance of the interscalene block on Mr. Primeaux fell below the appropriate standard of care and constitutes medical malpractice. Dr. Shepherd testified that he had seen interscalene blocks being performed, but had not ever performed one himself. On cross-examination he also acknowledged that he was not an anesthesiologist, nor had he received any anesthesiology training. He did establish that in the chest x-ray performed seven days before the surgery, Mr. Primeaux's diaphragm appeared normal and there was no evidence of any paralysis. He stated that diaphragm paralysis would show up in the x-ray by Mr. Primeaux's left diaphragm being at a higher elevation than his right diaphragm.

It was also Dr. Shepherd's testimony that Mr. Primeaux was a poor candidate for the block procedure due to his large size, which he opined would make important landmarks difficult to observe. Despite these statements, Dr. Shepherd admitted on cross-examination that he had never seen an interscalene block performed on a patient of Mr. Primeaux's size. On cross examination Dr. Shepherd's knowledge of the actual events and circumstances of Mr. Primeaux's procedure was called into

5

question. He stated repeatedly that he knew Mr. Primeaux had not received full general anesthesia with muscle relaxation during the shoulder surgery; however, as the record shows, Mr. Primeaux did in fact receive both full general anesthesia and muscle relaxation for the shoulder replacement.

Dr. Robert Goldstein was the only anesthesiologist provided by Mr. Primeaux as an expert witness. Dr. Goldstein testified via videotaped deposition, which was played for the jury at trial. Dr. Goldstein was also the only anesthesiologist to state that Dr. Laborde's performance of the interscalene block fell below the appropriate standard of care. Dr. Goldstein stated in his deposition that, when the nerve stimulator is used correctly, the doctor should not ever come into contact with the phrenic nerve. He also stated that the procedure notes made by Dr. Laborde for Mr. Primeaux's interscalene block are so lacking in detail as to fall below the standard of care. In describing what he deems to be the appropriate information to include in procedural notes he included documentation of the milliamperage the doctor dials down to in order to get the appropriate muscle response, as well as a clear statement of what muscle response you are looking for in the procedure and what responses the patient gives during the procedure. He further stated that Dr. Laborde did not document pertinent positives or negatives, or any responses from the patient. In his opinion, Dr. Laborde's actions during the procedure and his documentation of the procedure itself fell below the standard of care and constitute malpractice.

Despite these statements by Dr. Goldstein, when questioned by Dr. Laborde's attorney he admitted that, even with nerve simulator equipment, it would not be negligent to actually come into contact with the phrenic nerve. In fact, the paresthesia technique, an acceptable method of performing interscalene blocks, does not use an electrically charged needle and the doctor performing the procedure will actually

6

touch nerves with the needle during the procedure to determine correct placement of the needle prior to injection of the anesthetic. Dr. Goldstein admitted that when using the paresthesia technique, needle contact with the phrenic nerve is expected and is not likely to damage the nerve. He also admitted that, if documentation in the procedural note indicates that the procedure was done with no complication and a satisfactory result was obtained, it would be more likely than not that the procedure was done appropriately and properly. And finally, Dr. Goldstein acknowledged that as an anesthesiologist you can have an adverse outcome following a procedure without having been negligent in the performance of that procedure.

Drs. Hector Herrera and William Dedo testified as experts for Dr. Laborde. Both doctors are anesthesiologists familiar with the interscalene block procedure, having performed the procedure several hundred times themselves. Dr. Dedo was one of the three anesthesiologists assigned to serve on the Medical Review Panel for this case. Both doctors directly contradicted Dr. Goldstein's testimony concerning the appropriate standard of care for documentation of an interscalene block in a doctor's procedure notes.

In his testimony Dr. Laborde responded to Dr. Goldstein's statements concerning documentation of the procedure as follows:

Q: Now, He also discussed that when you're using the nerve stimulator that you ought to say that you started at one milliamp, and that you turned down as described. You did not put that in your procedure note; is that correct?

A: I did not.

Q: Do you typically put that in your procedure note that you start at one milliamp --

A: I do not. It's a generally accepted way to perform a block, and so by giving a description of a nerve stimulator and insulated needle technique, it assumes all of those generally accepted parts of the

7

procedure. And he did not indicate that he puts that in his note until after the fact that I had a procedure note was made aware to him.

Dr. Laborde's contention that his procedural notes did not fall below the appropriate standard of care was corroborated by both Dr. Herrera and Dr. Dedo. Both anesthesiologists testified that they have a similar method for taking procedural notes, and that the level of detail indicated by Dr. Goldstein as the appropriate standard of care was inaccurate and overly detailed.

In his testimony Dr. Dedo stated:

A:     You can document everything until the cows come home, where you were standing, where the people in the room were, what the clock time said, what your clock time said. I mean, it can get ridiculous. If the block goes uneventfully and you write down the salient features of that block, i.e., the medications you used, the type of needle you used and whether the patient tolerated the block well and any complications you actually saw or were aware of, that basically is what you need to put down.

If there's a routine you stick with, and that's the routine you always use, then all the things that are routine, if they're fairly standard, then there's no reason to list every little detail that's just part of the routine.

Q:     If you stimulate the phrenic nerve during the course of this procedure, do you need to document that you stimulated the phrenic nerve?

A:     Absolutely not.

Neither Dr. Herrera nor Dr. Dedo were willing to state conclusively that Dr. Laborde's block was the actual cause of Mr. Primeaux's diaphragm paralysis. However, both doctors stated that, if it did cause the injury, based on their review of the medical records and the deposition testimony, it is their opinion that there was nothing Dr. Laborde could have done differently to avoid the injury. And more specifically, they both testified that, in their opinion, there was no malpractice on the part of the defendant, Dr. Laborde.

In his testimony, Dr. Dedo also read an excerpt of medical literature from the Cleveland Clinic Foundation, Department of General Anesthesiology, which was provided to the Medical Review Panel by Mr. Primeaux's attorney. That literature stated: "When a nerve stimulator technique is chosen, a 22-gauge blunt insulated regional needle is selected to be used with a variable voltage nerve stimulator. The landmarks and approach are the same, and the end point is either a motor-evoked response in the arm which persists or a good parenthesis, whichever comes first." This document, provided by the plaintiff, clearly indicates that coming into contact with the phrenic nerve is acceptable, and in fact expected, in the proper performance of an interscalene block of the brachial plexus, even where the nerve stimulation technique is used.

Both Dr. Herrera and Dr. Dedo testified that, despite Mr. Primeaux's size, and the opinion of Dr. Shepherd, he was a good candidate for the interscalene block procedure. Dr. Herrera testified as follows:

Q: Now, Dr. Shepherd, the internal medicine guy who talked yesterday said in a patient the size of Mr. Primeaux that it's going to be hard to see that response, the diaphragm response, when the phrenic nerve is stimulated. Do you agree with his position on that?

A: No, I do not agree.

Q: Why not?

A: Patients are going to notice this. It's just something that patients will notice, regardless of their size, a small person, large person, whatever. You stimulate the phrenic nerve, it's going to contract the diaphragm, and they're going to notice it.

Q: The physician, if you're the one doing the interscalene block, is it something as you're sitting there watching the patient that you're going to miss as a physician?

A: No, you're not.

Q: Is it conceivable to you that a doctor who's sitting there doing the

9

> procedure watching the patient is going to miss that sort of response in a patient?

A:      No.  No, it's not.

The testimony by the expert witnesses in this case is clearly contradictory.  This court has previously addressed the issue of credibility of expert witnesses in cases where medical specialists' actions are questioned.

> The law does not require perfection in medical diagnoses and treatment.  On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. *Broadway v. St. Paul Insurance Co.*, 582 So.2d 1368 (La.App.2d Cir.1991), and the cases cited therein.  When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. *Fox v. Our Lady of Lourdes Regional Medical Center*, 550 So.2d 379 (La.App. 3rd Cir.1989), *writs denied*, 556 So.2d 1263 and 556 So.2d 1264 (La.1990).  When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference.  It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony. *Arceneaux*, supra; *Broadway*, supra.

*Charpentier v. Lammico Ins. Co.*, 606 So.2d 83, 87 (La.App. 3 Cir. 1992).

The plaintiffs contend that the jury committed manifest error in failing to find that the most likely cause of Mr. Primeaux's injury was the negligence of Dr. Laborde.  They argue that the most likely cause of Mr. Primeaux's injuries is the interscalene block performed by Dr. Laborde.  They contend that the defendant only offered unlikely and speculative possibilities to explain Mr. Primeaux's injuries.  Therefore, under the precedent established by the Louisiana Supreme Court in *Fusilier*, 764 So.2d 74, they argue the jury committed manifest error in failing to find that the most likely cause of Mr. Primeaux's injury was the negligence of Dr. Laborde.

The supreme court made the following statement in *Fusilier*:

> Although we are always reluctant to overrule a jury's verdict, the jury's decision in this case was manifestly erroneous.  *None of the*

10

*experts testifying at the trial offered any plausible explanation for the injuries plaintiff suffered.* The perforations of plaintiff's aorta, duodenum, and mesentery were all dismissed as unfortunate "complications" of the procedure. The only explanation offered by defendant for perforating plaintiff's aorta, duodenum, and mesentery, is an unsupported allegation that plaintiff's aorta must have been displaced. However, the operative report does not reflect that observation, and none of plaintiff's medical records support defendant's contention that plaintiff had any anatomic abnormality or variation. *The only logical conclusion* is that Dr. Fusilier negligently inserted the needles, either by location or angle, and perforated Mrs. Fusilier's aorta, duodenum, and mesentery.

*Id*. at 81 (emphasis added).

This court has studied the above quote from *Fusilier* in great detail, and at great length. The opinion clearly seems to require not only that the plaintiff show that the defendant failed to comply with the appropriate standard of care in performing the procedure, and this failure to exercise that degree of care was the proximate cause of the plaintiff's injuries, but also that the defendant's experts show that there is some plausible cause for the plaintiff's injuries other than negligence on the part of the defendant doctor. This requirement would appear to require a res ipsa loquitur analysis, even though no mention was made in the *Fusilier* opinion that res ipsa loquitur was applied in that case.

In *Fusilier v. Dauterive*, 99-0692 (La.App. 3 Cir. 12/22/99), 759 So.2d 821, this court determined that res ipsa loquitur did not, and could not, apply under the facts of the case. Judge Peters addressed the issue of res ipsa loquitur in his dissent and felt it was applicable. Although the supreme court discussed Judge Peters' dissent to our opinion, and then appeared to apply the res ipsa loquitur analysis in the final paragraph of their decision, they did not explicitly find res ipsa loquitur applicable in their analysis of the facts and circumstances of the case. The supreme court's requirement in the quote above, that the expert witnesses provide a non-negligent cause for the accident, adds an additional point of analysis which we have not,

11

heretofore, undertaken in medical malpractice cases.

All medical testimony at trial acknowledged that the very nature of this procedure is such that the danger of coming into contact with the phrenic nerve is high. In fact coming into contact with that nerve is an expected event during this procedure. The medical experts all testified as to the extremely close proximity of these two sets of nerves, and the high probability that there will be some involvement of the phrenic nerve in a correctly performed interscalene block.

In addition to the expected interaction with the phrenic nerve in this procedure, the evaluation of this matter is further complicated by the fact that there is no clear consensus as to what actually caused Mr. Primeaux's diaphragm paralysis. There was no clear evidence that the nerve was actually severed, or even pierced, by Dr. Laborde's needle during the procedure. Even if it is assumed that the injury occurred during the interscalene block procedure, this failure to identify the actual damage to Mr. Primeaux's phrenic nerve that caused his left diaphragm paralysis makes it exceedingly difficult to say that Dr. Laborde could have prevented the injury.

No evidence was presented by any witness indicating that Dr. Laborde actually saw and ignored objective signals that he was near the phrenic nerve. While on the stand Mr. Primeaux never indicated that Dr. Laborde was not paying attention during the procedure, or that he was given objective evidence by the patient during the procedure that he was near the phrenic nerve and ignored such evidence. Both Dr. Laborde and Mr. Primeaux testified that there was also an assistant in the room watching for the patients' objective responses during the procedure. The interscalene block procedure was completed in approximately twenty-five minutes, and the block Dr. Laborde was attempting to perform was successful, meaning the appropriate block result was obtained. Dr. Laborde's procedural notes indicate that the procedure was

tolerated well by Mr. Primeaux and do not indicate difficulties or complications occurred during the procedure. According to expert testimony, these factors all indicate that there were no known complications or difficulties. There was no immediate indication during the procedure, or while in the hospital post operatively, that the patient was experiencing any difficulty breathing or any shortness of breath.

In light of these considerations, we conclude that sufficient evidence was presented showing Mr. Primeaux's injuries could have occurred without any negligence on the part of Dr. Laborde and that his actions during the interscalene block were within the appropriate standard of care for anesthesiologists performing this procedure.

As stated above, the trier of fact's determinations regarding credibility of witnesses and the weight to be given their testimony at trial are entitled to great discretion. Therefore, in light of our discussion above, it was not error for the jury to give the testimony of Dr. Shepherd less weight than the testimony of the expert anesthesiologists who took the stand. We also find no error in the jury's determination that Drs. Herrera and Dedo were more credible expert anesthesiologist witnesses than Dr. Goldstein.

## DECREE

We affirm the jury's finding that Dr. Laborde did not commit malpractice. All costs of this appeal are assigned to the plaintiffs.

**AFFIRMED.**