# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-1426

DAVID CHARLIE

VERSUS

LENO HAI CONGTANG, M.D.

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 69570-A
HONORABLE JOHN LARRY VIDRINE, DISTRICT JUDGE

**********

**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Elizabeth A. Pickett, Judges.

                                                              **AFFIRMED.**

**Nicholas Gachassin, Jr.**
**K. Nicole Reynolds**
**Gachassin Law Firm**
**P. O. Box 80369**
**Lafayette, LA 70598**
**Telephone: (337) 235-4576**
**COUNSEL FOR:**
        **Defendant/Appellant - Leno Hai Congtang, M.D.**

**James Steven Gates**
**Morrow, Gates & Morrow, L.L.C.**
**P. O. Drawer 219**
**Opelousas, LA 70571-0219**
**Telephone: (337) 942-6529**
**COUNSEL FOR:**
        **Plaintiff/Appellee - David Charlie**

**THIBODEAUX, Chief Judge.**

The plaintiff/appellee, David Charlie ("Charlie"), brought this medical malpractice suit against the emergency room (ER) physician who treated him at Savoy Medical Center (Savoy) when he arrived there with complaints of abdominal pain of a week's duration, nausea, and vomiting. The ER physician, defendant/appellant, Dr. Leno Hai Congtang, diagnosed gastroenteritis on December 8, 2005. He prescribed medication and discharged Charlie.

Within three days Charlie's appendix ruptured in half and caused a massive pelvic abscess. As a result, Charlie underwent a laparotomy, abscess drainage, and an emergency appendectomy three hours after his arrival at the ER of Ville Platte Medical Center on December 11, 2005. Following a bench trial, the trial court found malpractice and awarded Charlie $50,000.00 in damages. Dr. Congtang brought this appeal. For the following reasons, we affirm the judgment of the trial court.

I.

**ISSUES**

We must decide whether the trial court was clearly wrong in its finding of malpractice under La.R.S. 9:2794.

II.

**FACTS AND PROCEDURAL HISTORY**

David Charlie was admitted to the Savoy Medical Center ER as an "urgent" care patient at 12:16 p.m. on December 8, 2005. The triage nurse reported complaints of vomiting and abdominal pain of approximately one week's duration. She recorded nausea, diarrhea, cramping, hypoactive bowel sounds, and tenderness of the abdomen at the right lower quadrant and the left lower quadrant. Charlie's pain

level was a five on the pain scale of one to ten; his temperature was 99.5° F; and, he had not eaten since 6:00 p.m. on the previous day. The nurse also noted a potential knowledge deficit. When Dr. Congtang examined Charlie a few minutes later, Dr. Congtang reported a chief complaint of abdominal pain and recorded a soft abdomen with tenderness in the left lower quadrant only. Dr. Congtang documented no abnormal bowel sounds and found no guarding or rebound. He obtained x-rays, urinalysis, and blood work and reported an elevated white blood count and normal chemistries. Dr. Congtang diagnosed gastroenteritis and discharged Charlie with prescriptions to alleviate the nausea (Phenergan) and the diarrhea (Lomotil). Having receiving IV's of saline, Toradol, and Inapril, Charlie was released from Savoy in stable condition at 1:55 p.m.

However, Charlie's pain soon returned, and he saw his family physician, Dr. David Ware, on the following day, December 9, 2005. Charlie mistakenly told Dr. Ware that he had been diagnosed with constipation the previous day. Dr. Ware recorded low abdominal pain, greater on the left than on the right, beginning ten days prior, with the onset of nausea and vomiting three to four days prior to the visit. He found a soft and benign abdomen with no palpable masses and no guarding or rebound. Dr. Ware documented Charlie's complaints of loss of appetite, fatigue and fever. Charlie's recorded temperature was 99.4° F. Dr. Ware recommended magnesium citrate and fiber based upon the misinformation regarding constipation.

Two days later, at 8:35 a.m. on December 11, 2005, Charlie went to the Ville Platte Medical Center ER ("Ville Platte") with hypoactive bowel sounds, a temperature of 100.7° F, and lower abdominal pain in both quadrants at a level eight on a pain scale of one to ten. His status was again documented as "urgent" rather than "emergent." Blood work again showed an elevated white blood cell count,

2

though not as high as before. A CT scan was completed by 10:00 a.m. The CT scan suggested the presence of an abscess cavity measuring 5 centimeters in diameter, a thickened appendix, appendicitis and possible rupture with a walled off abscess. Dr. Isabel Oschner documented guarding during her examination, contacted the surgeon, and admitted Charlie at 10:20 a.m. with a diagnosis of acute abdominal pain and "Diverticulate Abscess vs. Appendiceal Abscess."

Charlie's appendix was in fact severely infected, ruptured in half, and abscessed. Dr. Pedro Mora performed an exploratory laparotomy, drainage of a massive, "torrential" peritoneal abscess, and an emergency appendectomy, just three hours after Charlie's arrival at the Ville Platte ER. Charlie was discharged on December 14, 2005, with over sixty staples at the incision site. Upon the removal of the staples, infection was present. Charlie received home health nursing assistance and wound care and was not released to return to work until March of 2006.

Charlie filed suit for mis-diagnosis and medical malpractice against Dr. Congtang in February 2008, seeking damages for medical expenses, lost earnings, physical and mental pain and suffering, and permanent scarring and disfigurement, not to exceed $50,000.00, exclusive of interest and costs. The trial court entered judgment in favor of Charlie in the amount requested. Dr. Congtang appeals the trial court's judgment.

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through*

*DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

    a.    the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

    b.    the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record, an appellate court may not reverse the trial court's judgment even if it is convinced that had it been sitting as trier of fact it would have weighed the evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

**Medical Malpractice**

Doctor Congtang contends that the trial court failed to follow the elements set forth in the statute governing medical malpractice, La.R.S. 9:2794, which provides in pertinent part as follows:

    A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq. . . . the plaintiff shall have the burden of proving:

        (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists,

4

optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Concisely stated, Charlie's burden consists of proving the standard of care for emergency physicians such as Dr. Congtang, whether his actions breached the standard of care, and whether his actions caused Charlie to suffer injuries that he would not have suffered but for the breach. We note that while the trial court may not have used all of the "buzz words" in its reasons for judgment and may not have specifically addressed each element in writing, the record establishes that the trial court had a reasonable basis for its conclusions.

Specifically in this case, Charlie alleges that Dr. Congtang failed to take an adequate history of his condition and failed to correlate the complaints of pain documented by the nursing staff with his own physical findings and with the blood test results. All of these omissions resulted in a failure to render a proper diagnosis of appendicitis.

5

More precisely, the triage nurse in this case documented Charlie's complaints of lower abdominal pain and tenderness in both the left and right quadrants, while Dr. Congtang only noted tenderness in the lower left quadrant. The nurse further noted Charlie's hypoactive bowel sounds and his failure to eat in the previous eighteen hours, while Dr. Congtang did not. Charlie asserts that the nurse's findings are consistent with a diagnosis of appendicitis, and that Dr. Congtang breached the standard of care by not finding what the nurse found, due to his inadequate examination and history. Moreover, Dr. Congtang indicated on his examination report that he had reviewed the nursing assessment of Charlie's condition. Therefore, Charlie asserts that Dr. Congtang should have correlated his findings with the nurse's findings, looked closer at other tests such as the blood work, and thereby recognized the possibility of appendicitis and ordered more tests, such as a CT scan.

In support of his claims against Dr. Congtang, in addition to the evidentiary discrepancies between the doctor's record and the nurse's record, Charlie relied upon the testimony of his expert, an ER physician for over twenty years, Dr. Gregory Skie. Dr. Skie testified that hypoactive bowel sounds are those that are barely present or well below normal, meaning that the intestine was decreased in its motility or its contractual activity in relation to some kind of infectious of inflammatory process. Dr. Skie stated that hypoactive bowel sounds are consistent with an infected appendix.

Dr. Skie further testified that in Charlie's ten days of symptoms, anorexia, an inability to eat, as well as other symptoms, is intermittent and fluctuates as the body fights infection, but that anorexia late in the process and prior to rupture is very common with appendicitis. Dr. Skie also testified that late in the course of an

acute appendicitis, the pain will gravitate to the right lower quadrant of the abdomen and will be peritoneal in nature, although it may begin in the epigastrum in the upper abdomen. As stated, the hypoactive bowel sounds, absence of food intake, and right lower quadrant pain were documented by the nurse, but not by Dr. Congtang. Dr. Skie further testified that symptoms less specific but important to appendicitis are gastrointestinal symptoms such as nausea and sometimes vomiting. An elevation of the white blood cell count indicates an inflammatory process within the body. These symptoms were documented by Dr. Congtang, and along with those of the triage nurse, indicate a diagnosis of appendicitis.

Dr. Skie's opinion report, in support of Charlie's allegations of medical malpractice, stated that the applicable standard of care in the treatment and assessment of ER patients "includes a thorough history and physical examination and the use of relevant diagnostic tests to aid in the development of a differential diagnosis," which he asserts had to have included appendicitis in this case. Dr. Skie further stated that a physician has a duty to the patient to fully evaluate and treat those conditions which threaten "life and limb" on an immediate basis. He opined that Dr. Congtang's treatment fell below the standard of care because a more thorough history would have given him a basis to consider acute appendicitis with a "higher index of suspicion," given the presence of right lower quadrant pain, hypoactive bowel sounds, and the elevated white blood cell count. It was Dr. Skie's opinion that infection had started and that immediate surgery would have ensued if Dr. Congtang had consulted a general surgeon, thereby preventing the rupture, which in his opinion had not yet occurred, the severe peritonitis and abscess, and the additional medical expenses and recovery time. Dr. Skie further opined that, given the physical symptoms and lab results in this case, and the life threatening possibility presented

7

by a ruptured appendix, imaging would have shown the infection and should have been done immediately.

Dr. Congtang, in asserting that he did not breach the standard of care, relied upon the testimony of his expert, Dr. Joseph Litner. Dr. Litner "vehemently" disagreed with Dr. Skie's report, making much of the fact that Dr. Skie criticized Dr. Congtang's "benign diagnosis [of] constipation," which, as indicated, was misinformation given out by the patient himself and picked up by several doctors in this case. In fact, Dr. Litner writes about twelve pages on this issue in his two reports, whereas Dr. Skie mentioned it only briefly. During his deposition, Dr. Skie acknowledged that he had seen the diagnosis of constipation somewhere in the material, but not remembering where, he would simply retract "constipation" and substitute the word "gastroenteritis." Dr. Skie criticized Dr. Congtang for his *benign diagnosis of gastroenteritis*, given the number of symptoms indicating appendicitis.

Dr. Litner pointed to the fact that Dr. Congtang and Dr. Ware both found that Charlie's abdominal pain exams did *not* show "rebound" or "guarding," which are symptoms of appendicitis. He explained that a positive rebound sign occurs when the physician pushes on the patient's abdomen, and upon the doctor's release of his hand, the patient complains of pain. Guarding occurs when the patient's abdomen is tense and resistant to palpitation. Positive guarding and rebound are signs of acute peritoneal irritation/inflammation, as found in appendicitis, diverticulitis, cholecystitis, or ruptured viscus. Therefore, according to Dr. Litner, a finding that there is no rebound or guarding contraindicates a finding of appendicitis.

Charlie testified that Dr. Congtang did not press on his abdomen, but merely laid his hand on it. Dr. Skie's testimony on this issue was that one would expect guarding and rebound only in the right lower quadrant of the abdomen and that

there was no evidence that Dr. Congtang palpitated Charlie's right lower quadrant because he did not document it. The triage nurse did examine the right lower quadrant and did document tenderness there. In fact, a major criticism by Dr. Skie was that Dr. Congtang did not document a thorough examination of the patient, and, therefore, it could not be known whether he examined areas which should have been examined.

Dr. Michael Peebles, a member of the medical review panel which found no malpractice on the part of Dr. Congtang, testified that the lab results could be consistent with appendicitis because the white blood cell count was elevated, but this also occurs with gastroenteritis, diverticulitis and food poisoning. He opined that the lab results showed no shift to the left in certain cells that would occur in appendicitis. Dr. Peebles stated that the white blood cell count is a number and that one does not treat a number on a lab result; one treats the whole patient. He said one would *expect* to see a shift to the left in the lab work; one would *expect* to see fever, anorexia, and vomiting with appendicitis, but this "constellation of symptoms doesn't occur in everyone."

The trial court in this case noted the conflicting expert testimony, the resolution of which is essentially a factual evaluation and is particularly within the province of the trial court. *See Foley v. Entergy Louisiana, Inc.*, 06-0983 (La. 11/29/06), 946 So.2d 144. We have specifically indicated that when expert opinions conflict concerning compliance with the applicable standard of care in a medical malpractice action, the trial court's conclusions will be granted great deference, as it is the sole province of the fact finder to evaluate the credibility of such experts and their testimony. *Primeaux v. St. Paul Fire & Marine Ins. Co.*, 03-466 (La.App. 3 Cir. 12/17/03), 862 So.2d 496, *writ denied,* 04-186 (La. 4/2/04), 869 So.2d 878.

Here, in addition to other evidence in the record, the trial court referenced five "flags" in the blood work results which indicated abnormalities and required further investigation by the ER physician. We note that the column in the referenced report is actually entitled "Flag," and it contains three "H's" for out of-range high counts and two "L's" for out-of-range low counts. The white blood cell count is one of the five abnormal counts. In summary, the trial court stated:

> It appears from the nurse notes that there was some indication of both left and right lower quadrant pain. After considering the testimony of Doctor Pebbles[sic], and the CBC Results with five (5) flags it is the opinion of this Court that had Dr. Congtang paid closer attention to the nurses notes, the CBC results and the complaints and symptoms of Mr. Charlie, he could have and should have ordered a C.T. Scan which would have showed the appendix in distress with the accompanying abscess. It is the Judgment of this Court that his failure to so recognize these signs and symptoms and his failure to order a C.T. Scan amounted to a breaching of the standard of care.

Based upon the totality of the evidence in the record, and the standard of review to which we are held, we cannot say that there is no reasonable basis for the trial court's judgment awarding $50,000.00 to Charlie for the mis-diagnosis of his condition by Dr. Congtang. The record reveals that an ER physician has a duty to perform an adequate examination of the patient and order further testing where indicated. Except for guarding and rebound, which in this case was not documented until after the appendix ruptured into two pieces, Charlie's symptoms were very similar at both ER facilities, Savoy and Ville Platte, indicating that infection was present and that the appendix was in distress in the first ER visit. If Dr. Congtang at Savoy had found the additional symptoms that his triage nurse found, or at least had correlated his findings with hers, there is a reasonable basis to conclude that he would have or should have ordered a CT scan, which would have led to a proper diagnosis

10

of appendicitis. It was, therefore, reasonable to find that his actions constituted a breach in the standard of care for ER physicians.

The record further supplies a reasonable basis to conclude that Dr. Congtang's failure to diagnose appendicitis on December 8, 2005, caused Charlie additional and more severe pain and suffering, and more medical expenses and lost wages, than would have otherwise occurred. We cannot find that the trial court was clearly wrong in its conclusions.

IV.

**CONCLUSION**

Finding that the record establishes no manifest error on the part of the trial court, we hereby affirm the judgment below.

All costs are assessed to Leno Hai Congtang.

**AFFIRMED.**